NOT DESIGNATED FOR PUBLICATION

No. 119,090

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of L.F.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Harvey District Court; JOE DICKINSON, judge. Opinion filed January 25, 2019.
Affirmed.

*Gregory C. Nye*, of Nye & Nye, of Newton, for appellant natural mother.

*Kaitlin M. Dixon*, assistant county attorney, for appellee.

Before MALONE, P.J., BUSER and STANDRIDGE, JJ.

PER CURIAM: S.F. (Mother), who is a minor herself, appeals the district court's order terminating her parental rights to her child, L.F., who was born in 2015, when Mother was 13 years old. Mother claims the district court erred in finding that she is unfit and that the conditions of her unfitness are unlikely to change in the foreseeable future. Finding no error, we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The Kansas Department of Children and Families (DCF) and its predecessor, the Kansas Department of Social and Rehabilitation Services (SRS), have a history with Mother's family going back to at least April 2004, when an investigation was made into an eventually unsubstantiated allegation that Mother and her siblings were children without proper care and control. Additional investigations of the family occurred in 2007,

as did three investigations in 2011 and one in February 2012, but the allegations that initiated all of these investigations were eventually found to be unsubstantiated.

In April 2012, however, SRS investigated a report of alleged emotional abuse of Mother and three of her siblings by Mother's mother, R.F. (Grandmother), and her boyfriend, M.M. The investigation revealed ongoing domestic violence in the home, including M.M. cutting Grandmother with a knife and M.M. threatening the children. M.M. was substantiated for emotional abuse.

In October 2015, DCF concluded that Mother was "without proper care and control for being expelled for fighting and drugs at school." Mother was associating with and using drugs with peers who provoked her to fight with others. By this time, Mother had been arrested twice and was using marijuana and alcohol.

Mother gave birth to L.F. on December 30, 2015. In May 2016, DCF received a report that Mother and Grandmother had argued, resulting in Mother taking L.F. and moving to a friend's home. Grandmother believed that the friend's home was "not fit" for L.F., so she asked Mother to return to live with her. DCF "intervened" and Mother and L.F. immediately returned to Grandmother's home. Grandmother informed DCF that she had "no control of [Mother's] behaviors for some time," and that she let Mother leave the home whenever she pleased in order to prevent violent confrontations.

DCF connected Mother and Grandmother with services, including a program called High School Parents as Teachers. In addition, Grandmother accepted Family Preservation Services, which began in June 2016, and a case plan was written on June 17, 2016. Mother's family members underwent mental health assessments through Saint Francis Community Services (SFCS). DCF paid for L.F.'s immunizations, and it also paid for Mother and Grandmother to attend parenting classes in the HOPE Program.

In the summer of 2016, Mother threatened suicide and law enforcement reported that Mother had been cutting herself, so Mother was taken to Prairie View for mental health treatment. Upon her release, Mother went to live with the mother of E.E., L.F.'s alleged father. Mother left L.F. with Grandmother and saw L.F. for only "a few hours" during the next two weeks when Grandmother took L.F. to visit Mother. Mother admitted that during one visit she took a plastic bag and placed it over L.F.'s head "to be funny," but Mother maintained that Grandmother took the incident out of proportion when she reported it to law enforcement.

On July 5, 2016, police responded to a disturbance at Grandmother's home and found Mother attempting to take L.F., who was six months old at the time, to go stay with E.E.'s mother. Grandmother did not believe that this living situation was in L.F.'s best interest due to L.F. potentially being allergic to animals at E.E.'s mother's home. When police officers decided that L.F. should stay with Grandmother, Mother "became unmanageable," yelling and cursing. Mother "threw a baby seat and a diaper bag directly where [L.F.] was," but an unidentified person caught the items, so they did not hit L.F.

*The State files a CINC case*

On July 8, 2016, the State filed a petition, see K.S.A. 2017 Supp. 38-2234, asserting that L.F. was a child in need of care (CINC). L.F. was taken into DCF protective custody and placed with the foster family with whom she lived for the duration of the case. Don Snapp was appointed guardian ad litem for L.F., and on July 14, 2016, the district court held a temporary custody hearing at which Mother appeared in person and through counsel. After accepting into evidence the CINC petition and attached affidavit, the district court ordered that L.F. be placed in the temporary custody of DCF. The district court scheduled the adjudication hearing for August 15, 2016.

Mother began visitation with L.F. on July 14, 2016, and by August 1, 2016, Mother had participated in four one-hour monitored visits with L.F. at the SFCS office. Mother and L.F. spent the first 30 minutes of each visit alone, and other family members participated in the final half of each visit. A later report from Juan I. Coy Teni, Mother's SFCS case manager, indicated that Mother "engaged with [L.F.] very well. [Mother] gives a lot of affection [to L.F.]; [Mother] talks, hugs, kisses, reads books, and plays with her daughter. There have not been safety concerns to report." The plan was to increase the length of visits and begin having them at family residences once case plan task completion began.

The case plan conference occurred on July 25, 2016. The resulting permanency plan identified several tasks for Mother and Grandmother to work toward the goal of permanency. Teni prepared a report for the district court on August 5, 2016, in which he recommended that L.F. remain in out-of-home placement in the custody of DCF.

The district court held the adjudication hearing on August 15, 2016, and Mother stipulated that L.F. was a CINC. Accordingly, the district court adjudicated L.F. to be a CINC, ordered that L.F. remain in DCF custody, and scheduled the dispositional hearing for September 13, 2016.

Teni prepared a report for the district court on August 31, 2016. Teni reported that the visitation was "going well and there are not safety concerns reported." With respect to the case plan tasks, Teni reported that Mother continued to progress; she had been participating in parenting classes at Heartland Pregnancy Care Center, attended two individual therapy sessions at Prairie View, and had a third session scheduled. According to Grandmother, Mother was following the rules at home and doing her chores. By contacting Newton High School, where Mother attended school, Teni learned that Mother had been "involved in a behavioral problem [but n]o sanction was implemented."

4

At a hearing on September 13, 2016, the district court found that the appropriate public and private agencies had made reasonable efforts to facilitate the permanency plan, and it approved and adopted the proposed permanency plan, which stated reintegration as its goal. The district court ordered L.F. to remain in DCF custody and ordered Mother to complete her case plan tasks. The court set a review hearing for November 22, 2016.

Mother tested positive for marijuana on October 31, 2016. On November 7, 2016, Mother, M.M., and two of Mother's siblings all tested positive for marijuana.

Teni prepared another report for the district court on November 8, 2016. He reported that SFCS had helped Mother and Grandmother move to a new residence. Shortly after their relocation, however, Grandmother informed him that her boyfriend M.M. was moving in as well. M.M. was facing pending criminal charges and was listed in the DCF Child Abuse/Neglect Central Registry as an individual confirmed, validated, or substantiated for abuse or neglect.

Teni further reported that Grandmother had informed him that Mother continued to struggle with school attendance and that Mother's behavior, such as using inappropriate language toward teachers and administrators, had led to multiple school suspensions. Teni also suspected that Mother was not following Grandmother's rules at home, despite Grandmother's reports to the contrary. Moreover, Grandmother had informed Teni that Mother had stopped participating in individual therapy because they could no longer afford it. Mother's probation officer informed Teni that Mother's probation would last six additional months because Mother had not yet completed an anger management program, which she was supposed to be completing through individual therapy.

Although Mother had been attending parenting classes, staff informed Teni that the family arrived late to every session and provided excuses for their tardiness. Regarding the Parents as Teachers program, Grandmother reported that the program was no longer operating, but when SFCS contacted Melissa Meyer from the program, she stated that her efforts to reach the family to schedule a visit had been unsuccessful and she had not known that Mother and Grandmother had moved to a new residence. SFCS indicated it would provide contact information to Mother and Grandmother for the Parents as Teachers program.

With respect to visitation, Teni reported that Mother's visitation with L.F. had increased to 5.5-hour, weekly, monitored visits at Mother's home. Mother was "interacting properly with [L.F.]" and Teni stated that "the challenge for [Grandmother and Mother] is to make sure [Mother] spends enough time with [L.F.] to keep improving her parental skills and decision making skills to keep [L.F.] safe" despite Grandmother's tendency to "take over." The report also indicated that L.F. was up to date on her immunizations. Teni ultimately concluded that reintegration remained a viable goal but recommended that L.F. should remain in out-of-home placement under DCF custody.

Mother completed a drug and alcohol evaluation on November 16, 2016. At the November 22, 2016 review hearing, the district court found that there had been adequate progress toward reintegration and that reintegration remained a viable goal. The district court continued its previous orders and set a permanency hearing for March 21, 2017.

On December 5, 2016, Mother tested positive for marijuana. On December 19, 2016, Newton High School reported to the district court that Mother was a truant student. Mother had missed school five days in September 2016, two days in November 2016, and three days in December 2016.

On January 3, 2017, Mother tested positive for marijuana. On January 4, 2017, the district court appointed a Court Appointed Special Advocate (CASA) for L.F. The CASA made recommendations to the court about L.F.'s progress for the remainder of the case.

On January 6, 2017, Teni prepared a report for the district court in anticipation of the permanency hearing in which he stated that Mother was "struggling to make progress completing her tasks." Teni indicated that Grandmother stated she had applied for a medical card for Mother but "has not been able to finish the process," so Mother was unable to resume individual therapy. The visitation summary remained unchanged from the November 2016 report, stating that Mother was interacting properly with L.F. at their weekly, 5.5-hour monitored visits at Mother's home, and that Grandmother was willing to keep working on letting Mother be L.F.'s direct caregiver during the visits. Similarly, Teni's recommendations remained the same: reintegration was still viable, but L.F. should remain in out-of-home placement in DCF custody for the time being. The report also stated that paternity testing ruled out E.E. as L.F.'s father.

In January 2017, there was another case planning conference. The resulting permanency plan stated:

> "[Mother] has not been able to make progress towards reintegration. She is struggling with school, academically and behaviorally. [Mother] has not been able to start mental health services. [Mother] has to complete a drug and alcohol evaluation and follow recommendations. In addition, the family dynamics at her house need to change to offer a safety [*sic*] and healthy environment for [L.F.] In one occasion [*sic*], [Mother], [alleged Father], and [Mother's] brother and sister tested positive for marijuana. In addition, [Grandmother] is living with a man who is registered in the center of child abuse and neglect."

7

On February 8 and 15, 2017, Mother attended individual therapy with Laura Sharp, LCSCW, LCAC, who reported Mother's goals were sobriety and an improved relationship with Grandmother. Sharp indicated that "the progress on these two goals is slow." Sharp went on maternity leave, and Mother was referred to another agency for therapy, but Grandmother later informed SFCS that the agency to which they were referred did not offer therapy for individuals of Mother's age. On February 10, 2017, Mother took a drug test and tested positive for marijuana.

On March 1, 2017, SFCS reported that Grandmother "was unable or unwilling to provide [an] appropriate level of supervision to keep [Mother] safe from engaging in negative, unhealthy behaviors." Accordingly, Mother was placed at a youth center facility. Mother had to be removed from her initial youth facility placement due to her behavior, which included threatening to run away, threatening to harm herself, and being disrespectful toward staff. After two additional temporary placements at other locations, Mother was placed at a fourth facility. However, Mother was physically and verbally abusive, she damaged property at the facility, and she left the facility without permission, so the facility told SFCS to find her a new placement. SFCS found another placement, but the new facility similarly reported that Mother was defiant and had difficulty adjusting to rules.

Meanwhile, on March 8, 2017, Teni prepared another report for the district court. He indicated that Mother had been diagnosed with mild cannabis disorder, oppositional defiant disorder, and mild alcohol use disorder. Mother's probation officer also informed Teni that Mother had only two sessions left to complete the anger management program. As to Mother and Grandmother continuing the Parents as Teachers program, Teni reported that they "did not seem motivated" to participate. Teni concluded that reintegration remained a viable goal, but that L.F. should remain in DCF custody and with out-of-home placement.

8

Mother's placement at the youth center facility continued to be tumultuous. On March 9, 2017, Mother ran away from placement but returned 15 minutes later. Two days later, Mother was screened for acute care after leaving her placement without permission and telling law enforcement that she wanted to hang herself. The following day, Mother threatened to stab the director of the facility with a knife and Mother broke a window with the knife.

On March 21, 2017, the district court held a permanency hearing, at which Mother appeared in person and by counsel. The district court found that reintegration continued to be a viable goal.

On March 24, 2017, Mother was physically restrained by staff at her placement after she attempted to run away and kicked cars belonging to staff. On April 12, 2017, Mother physically assaulted placement staff and damaged property. However, Mother completed parenting classes on April 17, 2017, and she completed the required anger management program sometime that month as well. Yet on May 4, 2017, Mother left school after being told to leave her classroom because she was disrespectful toward a teacher.

In a report prepared for the district court on May 9, 2017, Teni noted Mother's difficulties since going into DCF custody, and he noted his continuing concerns over M.M. living with Grandmother. However, Teni also noted that Mother had tested negative for all substances on the two drug tests she had taken since her February 10, 2017 positive result for marijuana. Teni ultimately recommended that L.F. remain in her out-of-home placement in DCF custody, but he believed that reintegration remained a viable goal.

Mother continued to exhibit behavioral issues in her own DCF placement. On May 14, 15, and 16, 2017, Mother engaged in physical altercations with peers. On May 14 and

19, 2017, she ran away from the facility. The following day, after she returned, Mother threw objects, destroying a television, the plexiglass box encasing it, a DVD player, DVDs, clothing, and furniture. About 30 minutes later, Mother and a peer ran away again, returning 4 hours later. Staff at the facility reported that Mother's behavior scared the other residents.

Mother's misbehavior was brought to the district court's attention in a report Teni prepared on May 23, 2017. Teni reported:

> "[Mother's] recent behaviors represent a safety concern if she would be in charge of taking care of [L.F.] In addition, [Mother's] recent disruptive and violent [actions] are concerns that question if [Mother] will be able to develop maturity and be mentally health to take care of her child. She has been physical[ly] and verbally abusive. She has refused to attend school regularly and does not want to follow directions. SFCS would like to see these behaviors changed in order to consider [Mother] as a reintegration option for [L.F.]"

As a result, Teni recommended that L.F. remain in DCF custody and out-of-home placement and that the goal be changed to "reintegration/adoption."

Mother's behavioral issues continued. On May 27, 2017, Mother and a peer went in and out of a cottage without permission and then left the facility without permission at about midnight, returning at 8:30 a.m. On May 29, 2017, Mother ran away twice. A report from the facility on May 30, 2017, stated that Mother had left without permission on three consecutive nights and she attacked a peer.

On June 23, 2017, Mother was admitted to the Psychiatric Residential Treatment Facility (PRTF) at Prairie View. She began attending weekly individual therapy, group therapy three to four times per week, and weekly family therapy. On July 9, 2017, Mother tested positive for cannabinoids, and she began attending weekly drug and

alcohol counseling with Sharp. On July 11, 2017, Mother refused to follow directions from staff, became upset, and kicked a door. On July 14, 2017, Mother attempted to run away from PRTF. In addition, Mother was restrained by staff at the PRTF twice, both times for "elopement episodes and aggressive behaviors after being redirected."

On August 24, 2017, Teni prepared yet another report for the district court. He indicated that PRTF staff reported that Mother had made "significant progress" toward her goals of anger management, not running away, and not using physical and verbal aggression toward staff and peers. In addition, Mother had two clean drug tests since the positive test on July 9, 2017. Teni also stated that Mother had four-hour, monitored, weekly visitations with L.F. at Grandmother's residence, with no safety concerns. The report indicated that Mother had made progress on many of her case plan tasks.

On August 29, 2017, at the recommendation of PRTF clinicians, Mother was discharged from PRTF and reintegrated with Grandmother. Mother resumed weekly, four-hour, unsupervised visits with L.F. at Mother and Grandmother's home with no safety concerns reported. Similarly, Grandmother reported no safety concerns but at times expressed that Mother was not following the rules at home.

At a permanency hearing on September 5, 2017, the district court changed the case plan goal to reintegration with a concurrent goal of adoption. Mother had three unexcused absences, two tardies, and eight days of suspension from school in September 2017. Her grades consisted of F's and one D. However, both drug tests Mother took in September were negative, and Mother completed outpatient drug and alcohol treatment on September 13, 2017.

Teni noted the above events in a report prepared for the district court on October 27, 2017. He concluded:

"Even though [Mother] has completed the majority of her case plan tasks, she continues to struggle with behaviors at home and at school. . . . [S]he has had several suspensions and unexcused absences at school. [Grandmother] has expressed on several occasions[] that sometimes she really does not have the energy to raise [Mother] due to [Mother's] defiant behaviors."

Further, "SCFS is aware of [Mother's] age and how this might affect her ability to become a parent and a role model for [L.F.] . . . , but it would be hard to predict how much time this would take." Noting that L.F. had been in custody at her current foster home for 16 months, since she was 6 months old, Teni believed that it was in L.F.'s best interest "to look for other permanency options so she can continue growing healthy and her physical, medical and educational needs are satisfied." Thus, he recommended changing the case plan goal to adoption because reintegration with Mother was no longer viable.

On November 8, 2017, Grandmother called SFCS, reporting that she "was having difficulty managing [Mother's] behaviors," but during a follow-up conversation the next day, Grandmother said that "she was able to manage the situation and that everything was fine." A report Teni later prepared for the district court related this contact with Grandmother, as well as reporting that Mother was failing classes at school and "struggling" to follow the rules at home. Teni repeated his recommendation to change the case plan goal to adoption alone. A report filed by the CASA on November 21, 2017, similarly recommended changing the case plan goal to adoption, concluding that the original concerns in the case had not been satisfactorily resolved.

At a permanency hearing on November 21, 2017, the district court agreed, finding that although the agencies had made reasonable efforts to assist and support the family in accomplishing reintegration, the family's progress was inadequate, so reintegration was no longer a viable option. The district court scheduled a termination hearing for February 26, 2018.

*Termination proceedings*

On January 22, 2018, the State filed its motion to find Mother unfit and terminate her parental rights. The termination hearing occurred on February 26, 2018; Mother appeared in person and through counsel. At the hearing, the State first called Brian Becker, assistant principal at Newton High School. Becker testified that he worked with students on attendance, academic, and discipline issues and, in that capacity, he had worked with Mother over the year and a half prior to the hearing. According to Becker, Mother exhibited unwillingness to follow teacher expectations and had attendance issues. Relying upon exhibits that were admitted into evidence without objection, Becker testified that, at the time of the hearing, Mother's grades were three F's, two D's, and a B and that she was not on track to graduate high school in her expected graduation year.

Becker further testified that Mother had an individualized education plan (IEP), which consisted of "special education services that provide services based on certain disabilities a student might have." Becker described Mother's IEP as including both "an academic piece" and a behavior plan, which is a system designed for students who exhibit defiant behavior patterns. Becker indicated there were 29 discipline incidents reported since August 2017, predominantly involving Mother's failure to comply with a teacher or administrator and/or Mother using inappropriate language. Becker testified that Mother was absent 138 class periods (5 class periods per day) and had 17 tardies in the fall 2017 semester and Mother was absent 35 class periods and had 2 tardies in the spring 2018 semester so far.

Next, the State called Elizabeth Belden, Mother's current individual outpatient therapist at Prairie View. Mother had been referred to Belden while in PRTF and had been seeing her generally every other week since August 2017. Mother was diagnosed with disruptive mood dysregulation disorder, which Belden described as causing Mother to be "unable to regulate her moods so they can fluctuate from being very happy and

13

being very angry and able to regulate and calm herself down." Belden explained that this was "more of an adolescent diagnosis . . . not an adult diagnosis" and that generally this diagnosis would be reevaluated between the ages of 18 and 26. Belden worked with Mother to teach her techniques such as breathing skills, listening to music, and writing or drawing her feelings in order to regulate her moods. They also discussed how Mother's behaviors affected her likelihood of regaining custody of L.F., and Belden testified that over the two prior months, Mother had come to understand that her behavior directly affected L.F.'s custody.

The State next called Sharp, the outpatient substance abuse treatment coordinator at Prairie View. Sharp completed a substance abuse assessment of Mother in November 2016, and she met with Mother individually for 12 sessions, seeing her last on September 13, 2017. Sharp testified that Mother successfully completed treatment, which entailed achieving 30 consecutive days of sobriety, and that by the time Mother was discharged, she had 2 months' sobriety.

The State next called Teni, the social worker at SFCS, who testified about the history of the case. Teni testified that there was no issue with Mother completing the tasks of attending L.F.'s doctor's appointments, obtaining a mental health evaluation and following the recommendations, or completing parenting classes. However, Teni testified that he had concerns about Mother and Grandmother's home because M.M. still lived there. The district court also took judicial notice that M.M. was convicted on February 10, 2017, of unlawful possession of a controlled substance. Teni also testified that he was concerned about Mother's ability to control her anger and that Mother had threatened him, became angry with him, and used profanity around him. Teni stated that he was concerned with Mother's "ability to be patient and mature enough to monitor anger so she can ensure the safety of her child and be a good role model for her child." When asked why he recommended termination of parental rights, Teni stated:

14

"Because of the history of behaviors at school, at the house, the history of substance abuse, and because I would imagine that being a parent at age 14 or 15, it would be a huge commitment and a huge change that the person has to make in order to be that role model and that parent in order to raise a child, and I have seen during all this time since the referral that she has been able to—to be successful at some points and then—but there's not a steady indication that she's ready to make this radical changes [*sic*] from being a kid, 14, 15-year-old kid, to become an adult that is going to have this huge responsibility of raising a child."

When asked whether he could "see [Mother] changing her behavior in the foreseeable future," Teni replied, "I would probably say she would change, but how long is this going to take, how long do we have to have the kid in the system in order to see that change." Teni opined that it was in L.F.'s best interest for Mother's rights to be terminated and, regarding SFCS's efforts to help Mother, Teni stated: "[W]e've provided the help [Mother] need[s], and, unfortunately, we didn't see the results we talked to them about to regain custody of the child . . . —unfortunately . . . I'm not sure if we give more time . . . [I'm] not sure if that's going to help or make changes."

The termination hearing reconvened the following day and Grandmother testified on Mother's behalf. Grandmother asserted: "[Mother's] an awesome mom. She does everything with her daughter, changes her diaper, wipes her nose, whatever she needs, she gets it for her." She opined that "with proper help," Mother had the maturity and discipline to parent a two-year-old child.

After hearing the evidence, the district court found that Mother was unfit and unable to care properly for L.F. and that the conduct or condition that rendered Mother unfit is unlikely to change in the foreseeable future. The district court also found that it was in the best interest of L.F. to terminate parental rights. Accordingly, the district court terminated Mother's parental rights. Mother timely appealed.

15

On appeal, Mother contends that the district court's findings that she was unfit and that her unfitness was unlikely change in the foreseeable future was not supported by sufficient evidence. Mother acknowledges that there were "problems at home" after L.F. was born but that she completed all of the case plan tasks set for her other than those related to school. Mother contends that because there was not clear and convincing evidence that her being a bad student means that she is an unfit parent, the district court erred in finding her unfit and terminating her parental rights. Mother does not challenge the district court's finding that it was in L.F.'s best interest to terminate parental rights.

In response, the State argues that Mother's problems at school reflect her continued defiance, which in turn demonstrates that earlier concerns about Mother's behavior and volatility were unresolved and the family has not been successfully rehabilitated, despite the agencies' efforts. The State also asserts that at the time of the termination, Mother "was still exhibiting the exact same behaviors at school and at home that she demonstrated at the beginning of the case," which shows a lack of effort on her part to adjust her conduct. The State contends that based upon Mother's conduct "throughout the length of this case, it is unlikely she would be a qualified baby-sitter for a two[-]year-old, much less a mother who could exhibit the proper mindset and actions needed to parent a young child." Finally, the State argues that disruptive mood dysregulation disorder "could take until [Mother] was between the ages of 18 and 26 for her to begin to show major improvement," and "L.F. waiting three to nine years for her mother to possibly start behaving better and gaining the maturity she would need to care for L.F. is not in L.F.'s best interests."

> "A district court may terminate parental rights only after a child has been found
> to be a child in need of care and the courts find by clear and convincing evidence that:
> [(1)] the parent [is] unfit and unable to care properly for a child; [(2)] the conduct or
> condition that renders the parent unfit is unlikely to change in the foreseeable future; and

16

[(3)] it is in the best interests of the child to terminate parental rights. See K.S.A. [2017] Supp. 38-2269(a) and (g)(1).

"Various statutes set out the criteria a judge must consider when deciding termination questions. When deciding unfitness of a parent, the court must consider a list of factors in K.S.A. [2017] Supp. 38-2269(b) and any other factors the court deems appropriate. When the child is not in the parent['s] physical custody—such as the case here—the court must also consider four additional factors listed in K.S.A. [2017] Supp. 38-2269(c). Proof of any one of these factors may establish grounds for termination of parental rights. K.S.A. [2017] Supp. 38-2269(f). In deciding whether termination of parental rights is in the best interests of the child, the court must give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. [2017] Supp. 38-2269(g)(1). The passage of time for improvement must be taken into account because we deal with young, impressionable lives. . . .

"For our part, when we review a district court's termination of parental rights, the law requires us to consider whether, after our review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could find it highly probable, *i.e.* by clear and convincing evidence, that the parent's rights should be terminated. In making this determination, this court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. [Citation omitted.]" *In re D.H.*, 54 Kan. App. 2d 486, 488-89, 401 P.3d 163, *rev. denied* 307 Kan. 987 (2017).

The factors on which the district court relied to find that Mother was unfit and unable to properly care for L.F. are not clearly identified. The written journal entry sets forth neither statutory factors nor facts that support the termination of Mother's parental rights. In the ruling from the bench at the termination hearing, the district court similarly did not clearly identify the statutory basis for termination, instead "agreeing with the sentiments of Mr. Snapp [guardian ad litem] with each and every thing he went through." Snapp had discussed various statutory factors at length and argued that K.S.A. 2017 Supp. 38-2269(b)(7) and (8) applied to this case.

K.S.A. 2017 Supp. 38-2269(b)(7) is "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." Regarding this factor,

17

Snapp emphasized that the proceedings in this case had already lasted past the federal guidelines of achieving permanency within a year, and he noted that L.F. had only been in Mother's custody for six months out of the two years of L.F.'s life.

K.S.A. 2017 Supp. 38-2269(b)(8) is "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." Regarding this factor, Snapp stated:

"[Mother's] done what's been asked of her and, of course, she has a lot of help. She has [Grandmother] right there making sure she does those things. [Grandmother] testified she drove her to these appointments, she drove her to these classes, she drove her to anger management, this and that, and [Grandmother] is a great resource and [Grandmother] seems to be a very good person and I commend her for it, but the effort has to be made not by the grandmother but by [Mother].

"And, you know, we have this diagnosis of disruptive mood dysregulation. She's gone to therapy, but her behavior continues. She's not projected to graduate from Newton High School. Her GPA is 0.50. The most recently—that's basically an F average.

"Now we know about—you know, there was a person—a well-known business person who was a high school dropout who was very successful. That's the rarity, but it can happen.

"But it's not so much the grades, which are concerning, but it's the behavior that I really don't see, based upon Mr. Becker's testimony, how she's still in school. . . . Mr. Becker said by all that criteria she shouldn't even be in school, but I guess they've adjusted and tried to keep her there, but she can't behave to the point where she can stay in class. She can stay in school. And it scares me, as an advocate for the child.

"Although [Grandmother] testifies [Mother] didn't have these behaviors at home, this child could be affected by that. [L.F. is] a very young two-year-old and what if something happens and [Mother] flies off the handle, so to speak, or whatever, who's going to protect this child? Well perhaps [Grandmother]. I don't know, but I think it's asking too much to place that child in that situation.

"And, you know, we just have run out of time. I hate to say it. I don't like it. I like, from what I can see of [Mother], I think they're good people. I know [Mother] has issues. I don't like making this recommendation, but I just, in my view, at least from a

18

legal analysis and from a factual analysis, these two factors—these two statutory factors do apply here, again 38-2269[(b)](7) and (8), and reluctantly, because I don't like making this recommendation, I do adopt the arguments of the State and I do recommend that, based on the law and the evidence, that termination should be ordered by the Court."

After stating his agreement with "each and every thing" Snapp had said, the district court noted that Mother had "made some recent improvements," but also stated that "there's big problems with behavior." Stating that it was "honing in on 38-2269[b](7) and (8)," the court noted that it was "unlikely" that the family would "rehabilitate" and stated that "multiple suspensions and incidents and things like that don't lead me to believe that this can get turned around in a reasonable amount of time." The district court emphasized that the case had been proceeding "going on two years" and visitation was still at four hours per week. The district court then stated:

"On those two points in particular, I'm finding that to be the case, that we can't wait another year or two for [Mother] at the young age of 15 to be able to care for the child on her own. I think it is fair to consider the efforts of [Grandmother] to help [Mother], and that's led her to a lot of these successful completions of case plans, but really the onus is on [Mother], still a child herself.

"At this point I always find myself using kind of a measuring stick for these cases, is the parent to the point where the parent can take care of herself, and right now [Mother] can't take care of herself. She's getting close to that and she's getting closer, and I will encourage her to not let this set herself back because she can still have a good life and still accomplish lots of things in her life. This is not the end of things at age of 15 for [Mother]. You have to go on."

The district court again emphasized the length of the proceedings so far and reiterated that Mother "is just in a place that she can't get her behavior together to the point—and really outrageous behavior in school." The district court concluded:

19

"I'm not trying to beat up [Mother], but the fact remains these are things that indicate to me that the right decision in this case is to find the State in fact met [its] burden of proof, but even though, granted, and everybody can see as a number of these case plans were completed, so that is what makes this an unusual case.

"But that's my findings on those particular statutes that I'm finding that, and I'm finding it's in [L.F.'s] best interest to terminate parental rights, and I'm finding the conduct or condition is unlikely to change in the foreseeable future. It's not the future forever. It's the foreseeable future. And I find that conduct is unlikely to change from this point. I find clear and convincing evidence of that."

In terminating Mother's parental rights, the district court focused on Mother's behavioral and academic problems at school. But we agree with Mother's claim that there was not clear and convincing evidence that her being a bad student means that she is an unfit parent. The district court failed to articulate how Mother's difficulties at school "render[ed her] unable to care properly for [L.F.]," as required to find Mother unfit under K.S.A. 2017 Supp. 38-2269(a). Moreover, given that Mother can quit high school on her 16th birthday if she chooses, there was not clear and convincing evidence that Mother's conduct or condition is unlikely to change in the foreseeable future.

Although we agree with Mother's argument about her school performance, this point does not mean that the district court's finding of unfitness is not otherwise supported by clear and convincing evidence. The district court found Mother unfit under K.S.A. 2017 Supp. 38-2269(b)(7) based on the "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." The district court also found Mother unfit under K.S.A. 2017 Supp. 38-2269(b)(8) based on "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or condition to meet the needs of the child." Based on our review of the evidence, both findings are supported by clear and convincing evidence presented to the district court.

Belden, Mother's current individual outpatient therapist at Prairie View, diagnosed Mother with disruptive mood dysregulation disorder. Based on this diagnosis, Mother was admitted to the PRTF program at Prairie View on June 23, 2017. On July 9, 2017, while still in the program, Mother tested positive for cannabinoids. On July 11, 2017, Mother refused to follow directions from staff, became upset, and hit the door. On July 14, 2017, Mother attempted to run away from PRTF. In addition, Mother was restrained by staff at the PRTF twice, both times for her aggressive behavior. Although Mother ultimately was discharged from PRTF, the evidence is clear that her success in the program was far less than expected or desired.

Even more telling is the history of Mother's behavior at the youth center facilities. Mother had to be removed from her initial placement due to her behavior, which included threatening to run away, threatening to harm herself, and being disrespectful towards staff. After two additional temporary placements at other locations, Mother was placed at a fourth facility. However, Mother was physically and verbally abusive, she damaged property at the facility, and she left the facility without permission, so the facility told SFCS to find her a new placement. SFCS found another placement, but the new facility similarly reported that Mother was defiant and had difficulty adjusting to rules.

Teni, the social worker at SFCS, testified that he had concerns about Mother and Grandmother's home because M.M. still lived there. The original SRS investigation revealed ongoing domestic violence in the home, including M.M. cutting Grandmother with a knife and M.M. threatening the children. M.M. was listed in the DCF Child Abuse/Neglect Central Registry as an individual confirmed, validated, or substantiated for abuse or neglect. The district court also took judicial notice that M.M. was convicted on February 10, 2017, of unlawful possession of a controlled substance.

Teni also testified that he was concerned about Mother's ability to control her anger and that Mother had threatened him, became angry with him, and used profanity

21

around him. Teni stated that he was concerned with Mother's "ability to be patient and mature enough to monitor anger so she can ensure the safety of her child and be a good role model for her child." The evidence was clear and convincing that Mother was unable to successfully address the severe anger issues that she exhibited throughout the case.

When asked whether he could "see [Mother] changing her behavior in the foreseeable future," Teni replied, "I would probably say she would change, but how long is this going to take, how long do we have to have the kid in the system in order to see that change." We examine the foreseeable future from the perspective of a child. *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014). At the time of the termination hearing, L.F. was two years old and had only been in Mother's custody for six months of L.F.'s life. Despite Mother completing several task plans, none of the witnesses who testified at the termination hearing—other than Grandmother—could say that Mother was making substantial progress toward being able to parent her child.

Finally, Teni opined that it was in L.F.'s best interest for Mother's rights to be terminated. Snapp, the guardian ad litem, and the CASA assigned to the case also made similar recommendations. We note that Mother makes no attempt to challenge the district court's finding that it was in the best interest of L.F. to terminate Mother's parental rights.

In sum, we find that the record contains clear and convincing evidence that reasonable efforts to rehabilitate the family failed and that Mother demonstrated a lack of effort to adjust her circumstances and conduct to meet the needs of L.F. The district court's reliance on K.S.A. 2017 Supp. 38-2269(b)(7) and (8) was proper. We find no error in the district court's finding that Mother is unfit and unlikely to change in the foreseeable future. As a result, the district court did not err in terminating Mother's parental rights.

Affirmed.